**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

**IN RE:** Eligo Energy Litigation                               MDL-_____

**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION TO TRANSFER ACTIONS PURSUANT TO 28 U.S.C. § 1407**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................1

II.  BACKGROUND .................................................................................................................2

III. ARGUMENT .......................................................................................................................6

    A.  Legal Standard .........................................................................................................6

        1.  The actions share common issues of fact ...............................................8

        2.  Centralization will promote just and efficient litigation.......................10

            a)  Centralization will reduce or eliminate
                 duplicative discovery ....................................................................10

            b)  Centralization is necessary to avoid inconsistent
                 rulings and schedules ....................................................................12

IV. CONCLUSION ..................................................................................................................14

I.      INTRODUCTION

Eligo Energy is an energy service company, or an "ESCO," that provides electricity and natural gas in nine states plus the District of Columbia. In recent years, ESCOs have frequently been the target of consumer class actions accusing them of overcharging customers. *See generally Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 92 (2d Cir. 2019) (stating, in a class action against an ESCO, "[t]his is the latest in a line of class actions challenging consumer gas and electricity rates in the wake of market deregulation"). Eligo is one of the most recent targets and is now defending four separate putative class actions filed in four different federal district courts, each brought by the same firms and arising from the same alleged conduct.[1]

All four lawsuits accuse Eligo of breaching its customer contracts and misleading customers by failing to calculate variable electricity rates in accordance with contractually specified criteria. Indeed, the federal judge presiding over one of the suits, *Orzolek v. Eligo*, has already found that the plaintiffs' factual allegations are nearly identical from case to case. *See* Ex. 5 hereto (order issued in *Orzolek v. Eligo*, stating "the facts alleged in *Bodkin* are nearly identical to the facts alleged in *Brous* and this case").

But the four class actions now pending against Eligo do not just share a common factual core. Absent centralization, they also threaten highly duplicative discovery, inconsistent rulings on procedural and substantive issues, and substantial inefficiencies for both the parties and courts now presiding over them. That is particularly so because the earliest-filed action, *Brous v. Eligo*,

---

[1] As set forth in Eligo's accompanying Motion and Schedule of Actions, the cases are (1) *Brous v. Eligo Energy, LLC et al.*, Case No. 1:24-cv-01260-ER, United States District Court for the Southern District of New York, (2) *Bodkin v. Eligo Energy, LLC et al.*, Case No. 2:25-CV-00094-CB, United States District Court for the Western District of Pennsylvania, (3) *Orzolek v, Eligo Energy, LLC et al.*, Case No. 2:25-cv-00078-SDM-EPD, United States District Court for the Southern District of Ohio, (4) *Whiteside v. Eligo Energy, LLC et al.*, Case No. 1:25-cv-02532-JRR, United States District Court for the District of Maryland.

has advanced through discovery and is now on the eve of summary judgment motions. In that case, Judge Edgardo Ramos has issued **more than twenty** discovery rulings, overseen significant case management issues, and presided over extensive fact discovery. Eligo has reviewed more than 200,000 documents, produced more than 25,000, and made more than eight current or former employees available for depositions.

In stark contrast, discovery has not yet opened in the other three actions. But that has not stopped Plaintiff's counsel from serving discovery that shows they have no intention of honoring Judge Ramos's discovery rulings in *Brous*. For example, they have announced that they intend to re-depose the same witnesses in each case. It will be all but impossible to avoid duplicative discovery or to ensure consistent rulings among these four actions, unless they are centralized before Judge Ramos, who is by far the judge most familiar with the parties, their claims and defenses, and the counsel involved. Centralization is also consistent with Plaintiff's initial intent to bring a nationwide class action in *Brous*.

For all of those reasons, and as explained further below, this case meets all the requirements for centralization under 28 U.S.C. § 1407. *Bodkin*, *Orzolek,* and *Whiteside* should be transferred to the Southern District of New York to be coordinated and managed by Judge Ramos.

## II.    BACKGROUND

This spate of litigation against Eligo began in February 2024, with the filing of *Brous v. Eligo* in the Southern District of New York. Initially, *Brous* was filed as a national class action brought on behalf of Eligo variable-rate customers in all nine states where Eligo does business, plus the District of Columbia. *See* Ex. 1 hereto, ¶ 1 (original complaint in *Brous,* alleging that "this action seeks to redress Eligo's deceptive and bad faith pricing practices that have caused thousands of commercial and residential customers in Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington, D.C. to pay considerably

more for their electricity and natural gas than they should otherwise have paid"). The plaintiffs' core allegations in *Brous* were that Eligo breached its customer contracts by setting variable rates that were untethered to Eligo's costs of procuring energy, and that the contracts did not "give Eligo discretion to set prices as it sees fit." *Id*. ¶¶ 55-62.

Despite bringing a national class action, the named plaintiffs in Brous were and are residents of New York. Eligo therefore moved to dismiss the plaintiffs' non-New York claims on the grounds that they lacked class standing to bring them. The plaintiffs and their counsel could have cured that defect by adding plaintiffs from other states, but they either chose not to do so or could not find any non-New York residents willing to lend their names to a complaint against Eligo. So, the plaintiffs opposed Eligo's motion to dismiss, arguing that it was appropriate for two New York residents to represent absent class members from eight different states, and that their national class action should proceed in (and only in) the Southern District of New York.

*Brous* was assigned to Judge Edgardo Ramos, who has presided over the case since its inception. In that time, Judge Ramos has devoted substantial time and effort to managing the case, including ruling on more than twenty discovery motions. *See* Ex. 9 hereto (*Brous* docket). After nearly a year of litigation in *Brous*, and after Judge Ramos denied many of the plaintiffs' discovery motions, plaintiffs' counsel began to file additional putative class actions against Eligo in other federal district courts. That series of filings began with *Bodkin v. Eligo*[2], filed in the Western District of Pennsylvania in late January 2025. Like *Brous*, *Bodkin* was initially pled as a national class action brought on behalf of Eligo customers in eight states, plus the District of Columbia. *See* Ex. 2 hereto (Bodkin Complaint) ¶ 1. Bodkin therefore repeated the same substantive

---

[2] *Bodkin v. Eligo Energy, LLC et al*., Case No. 2:25-CV-00094-CB, United States District Court for the Western District of Pennsylvania.

3

allegations made in *Brous*. For that reason, Eligo moved to stay *Bodkin*, and that motion remains pending before the *Bodkin* court. *See* Ex. 3 hereto (*Bodkin* docket). No discovery or other substantive proceedings have taken place in *Bodkin* in the eight months since it was filed. *Id*.

Before *Bodkin* was stayed, however, Plaintiffs served written discovery on Eligo. The Plaintiffs' document requests and interrogatories were entirely duplicative of what they sought – and in many cases were denied by Judge Ramos – in *Brous*. That duplicative discovery was one of the reasons why Judge Bissoon of the Western District of Pennsylvania expressed serious doubts about whether Plaintiffs could maintain overlapping class actions in *Brous* and *Bodkin*, and invited Eligo to file its motion to stay.

Just days after filing *Bodkin*, plaintiffs' counsel filed yet another putative class action against Eligo, this time in the Southern District of Ohio. *See* Ex. 4 hereto (complaint filed in *Orzolek v. Eligo*). *Orzolek* was nearly a carbon copy of *Brous* and *Bodkin*. Like those cases, the *Orzolek* complaint sought to "redress Eligo's breach of contract that has [allegedly] caused tens of thousands of commercial and residential customers in Ohio, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington, D.C. to pay considerably more for their electricity and natural gas than they should otherwise have paid." *Id.* at ¶ 1.

Eligo moved to dismiss (or, in the alternative, stay) *Orzolek*. In a recently issued order, and without addressing Eligo's arguments for dismissal, the court stayed *Orzolek* in deference to *Bodkin* and *Brous*. *See* Ex. 5 hereto at 3 (order by *Orzolek* court examining the allegations in all three cases and stating that "the facts alleged in *Bodkin* are nearly identical to the facts alleged in *Brous* and this case"). As the *Orzolek* court noted, plaintiffs' counsel recently sought to amend their complaint in *Brous* to include only New York customers, and Judge Ramos granted that motion. *Id.* at 3. Similarly, in *Bodkin*, plaintiffs' counsel has moved for leave to amend to exclude

from the proposed class any members of the proposed classes in *Orzolek* or *Brous*. *Id*. at 4. That motion remains pending in *Bodkin*. *Id*.

Despite those proposed amendments, however, the substantive allegations against Eligo – that it overcharged customers in breach of its customer contracts – have not changed. If anything, the proposed amendments have underscored that all of the cases arise from the same factual core. Indeed, the complaints in *Bodkin* and *Orzolek* use information gained in discovery in *Brous* to further plaintiffs' theory that Eligo did not follow contractually specified criteria in setting variable rates. In particular, *Bodkin* and *Orzolek* rest on the identical allegation that Eligo breached its customer contracts because its "outrageous rates are the result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract documents given to prospective customers, but instead based on an assessment of how high a rate it can charge before too many customers quit, irrespective of Eligo's cost to supply the energy it simply resells at a markup." *See* Ex. 2 (Bodkin Compl.) ¶ 79; *Orzolek* (Ex. 4 ¶ 52). The second amended complaint in *Brous* (Ex. 6 ¶ 72) contains the same allegation as the most recently filed case, *Whiteside*. Ex. 7 (Whiteside Compl.) ¶ 42.

*Whiteside* was filed in the District of Maryland on August 1, 2025. *Id*. It seeks to certify a class of Eligo customers in seven states (including Pennsylvania, where *Bodkin* is pending) plus the District of Columbia. *Id*. ¶ 1. As noted above, *Whiteside* relies on the same substantive allegations as the three earlier-filed cases, in that it challenges the same alleged "uniform and consistent practice" of charging customers as much as they are willing to pay, as opposed to hewing to a contractually-required formula for setting rates that is based on Eligo's costs to acquire energy. *Id*. at ¶ 42. Indeed, each of the operative complaints contains a section alleging that Eligo's

variable rates were excessive because they exceeded those of the relevant local utilities, despite the utilities' energy acquisition costs allegedly being the same as Eligo's.

As in *Bodkin* and *Orzolek*, there have been no substantive proceedings in *Whiteside*, and no discovery has taken place. *See* Ex. 8 (*Whiteside* docket). The only case to have advanced into discovery is *Brous*. There, document productions and fact witness depositions have been completed. Both sides have exchanged expert reports. Eligo intends to file a motion for summary judgment within months, which will challenge plaintiffs' erroneous interpretation of the customer agreement on which *Brous* (along with the other three cases) is based. In particular, Eligo will explain that its customer contracts granted it discretion to set rates according to broad factors such as "market conditions," "market pricing" and/or "market price factors," which, according to plaintiffs' own allegations, appear in contracts at issue in each of the four cases. *See* Ex. 6 ¶ 3; Ex. 4 ¶ 3; Ex. 2 ¶ 3; Ex. 7 ¶ 4. Thus, Judge Ramos will soon be called upon to decide issues central to all four cases – namely, whether Eligo's customer contracts granted it discretion to set variable rates and, relatedly, whether Eligo's alleged "uniform and consistent practice" pricing strategy was inconsistent with the broad language of the customer contracts.

## III.   ARGUMENT

The purposes of centralization are to avoid inconsistent rulings and streamline litigation, for the benefit of the parties and federal courts. All of those purposes will be well served by transferring *Bodkin*, *Whiteside*, and *Orzolek* to the Southern District of New York, where the cases can be efficiently managed by Judge Ramos.

### A.   Legal Standard

To centralize actions under 28 U.S.C. § 1407, two requirements must be met. First, the actions must share "one or more common questions of fact." *Uber Techs., Inc. v. United States Jud. Panel on Multidistrict Litig.*, 131 F.4th 661, 671 (9th Cir. 2025) (quoting 28 U.S.C. § 1407).

Second, transfers must be "for the convenience of parties and witnesses and [must] promote the just and efficient conduct of such actions." *Id*.

As to the first requirement, "[t]ransfer under Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant where, as here, the actions still arise from a common factual core." *In re FTX Cryptocurrency Exch. Collapse Litig.*, 677 F. Supp. 3d 1379, 1381 (J.P.M.L. 2023); *see also In re: Home Depot, Inc. Customer Data Sec. Breach Litig.*, 65 F. Supp. 3d 1398, 1399–400 (J.P.M.L. 2014) ("As we have stated on numerous occasions, a complete identity of common factual issues is not a prerequisite to transfer under Section 1407, and the presence of additional facts or differing legal theories is not significant when the actions arise from a common factual core."). Moreover, "Section 1407 contains no requirement that common factual questions predominate over individual ones." *Id*. Nor is there a requirement of "complete identity or even majority of common factual issues as a prerequisite to transfer." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 669 F. Supp. 3d 1375, 1380 (J.P.M.L. 2023) (quoting *In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005)). The existence of differing legal theories is also no barrier to transfer. *See* Wright & Miller, Fed. Prac. & Prod. § 3863 (4th ed.) ("[T]he fact different legal theories are advanced in some or all of the cases [should not] prevent coordination and transfer.")

The second requirement – that transfer serves convenience and efficiency – is assessed in light of the MDL statute's purpose. *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1230 (9th Cir. 2006). Courts generally evaluate whether transfer will: (1) eliminate duplication in discovery, (2) avoid conflicting rulings and schedules, (3) reduce litigation costs, and (4) conserve the time and effort of the parties, the attorneys, the witnesses, and the courts.

7

*Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 410, (2015) (quoting Fed. J. Ctr., *Manual for Complex Litig.* § 20.131 (4th ed. 2004)).

Here, both requirements are met, and the cases should be centralized before Judge Ramos.

### 1. The actions share common issues of fact.

Section 1407 permits centralization "when civil actions involve one or more common issues of fact." Courts consistently apply this provision to cases arising from a "common factual core," even if there is no complete overlap. *In re Marriott*, 363 F. Supp. 3d at 1374. A "common factual core" exists where multiple complaints "overlap significantly" by naming the same defendants and alleging the same causes of action. *In re Keffer Dev. Servs., LLC, Data Sec. Breach Litig.*, 2025 WL 2327173, at *2 (J.P.M.L. Aug. 8, 2025).

All four cases arise from the same factual core. Each lawsuit names Eligo as a defendant and asserts the same (or substantially similar) breach of contract and state consumer protection claims. As noted above, and underscoring the close relation between all four cases, Plaintiffs used facts learned in discovery in *Brous* to support their allegations in *Bodkin*, *Orzolek*, *Whiteside*, and in the second amended *Brous* complaint. So, all four complaints now rest on the nearly identical allegation that Eligo's "rates are the result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract documents given to prospective customers, but instead based on an assessment of how high a rate it can charge before too many customers quit, irrespective of Eligo's costs to supply energy it simply resells at a markup." *See* Ex. 2 (*Bodkin* Compl.) ¶ 79; Ex. 4 (*Orzolek* Compl.) ¶ 52; Ex. 6 (*Brous* Second Amended Compl.) ¶ 72; Ex. 7 (*Whiteside* Compl.) ¶ 42. Each case will require the court to determine whether Eligo in fact had any such "uniform and consistent practice," and whether that practice breached Eligo's customer agreements. Those common factual issues are more than sufficient to supply the

"common factual core" necessary for centralization under 298 U.S.C. § 1407, regardless of other differences between the actions. *See, e.g.*, *In re Marriott*, 363 F. Supp. 3d at 1374.

The contracts themselves present additional common factual questions. Each complaint alleges that Eligo was obligated to tie variable electricity rates to its costs to acquire energy. For example, the recently-filed second amended complaint in *Brous* asserts that Eligo failed to base rates on "documented costs to supply energy", ¶ 5, and that its "supply costs cannot explain Eligo's egregiously high variable rates or the reason its rates are disconnected from changes in wholesale costs." *Id.* ¶ 71. The other complaints echo the same allegations. *See* Ex. 2 (*Bodkin* Compl.) ¶¶ 68-69, 71, 75; Ex. 7 (*Whiteside* Compl.) ¶ 40; Ex. 4 (*Orzolek* Compl.) ¶ 50.

Another common issue is whether Eligo's contracts granted it discretion to set variable rates, a potentially dispositive issue. *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 410 (2d Cir. 2023) (stating, in a class action against an ESCO, that "[t]he dispositive questions are whether an agreement entitled the energy services provider to use discretion in setting its rates and, if so, how the agreement cabined that discretion"). To that point, each of the four complaints alleges that "Eligo's contract does not provide Defendants with discretion to pick and choose other grounds for setting customers' variable rates." Ex. 7 (*Whiteside* Compl.) ¶ 5; Ex. 6 (*Brous* Second Amended Compl.) ¶ 5. And the fact that the plaintiffs served overlapping written discovery in *Brous* and *Bodkin* – even seeking documents in Bodkin that Judge Ramos ruled off-limits in *Brous* – confirms that the cases share a common factual core.

While there may be state-to-state differences in contracts and even within each state over the seven-year putative class periods, Section 1407 does not require complete overlap.[3] *See In re Marriott*, 363 F. Supp. 3d at 1374 (stating that Section 1407 "does not require a complete identity of common factual issues"). Those differences do not negate the presence of a common factual core for purposes of centralization. Plaintiffs' allegations share a sufficiently common core of facts to justify centralization in the Southern District of New York. *Id*.

### 2. Centralization will promote just and efficient litigation.

Centralization before Judge Ramos will also promote efficiency and justice across the four cases. Every factor courts consider in evaluating this issue strongly favors transfer.

#### a) *Centralization will reduce or eliminate duplicative discovery.*

Centralization before Judge Ramos will certainly eliminate what promises to be highly duplicative discovery if the cases are not transferred to the Southern District of New York. Discovery in *Brous* has been extensive: more than 25,000 documents produced, over eleven depositions completed, and 22 discovery motions decided. Ex. 9 (*Brous* docket). The *Bodkin*, *Orzolek*, and *Whiteside* plaintiffs are likely to seek the very same documents and depositions their counsel already obtained *Brous*. The plaintiffs in *Bodkin* have already done so, serving written discovery that substantially overlaps with what they served in *Brous*. The same can be expected in both *Orzolek* and *Whiteside*, thus subjecting Eligo to four overlapping sets of written discovery requests. The same will be true of depositions, where the plaintiffs will likely seek to re-depose the same Eligo witnesses who have already testified – some multiple times – in *Brous*. One of the primary purposes of 20 U.S.C. § 1407 is to stop precisely this sort of duplicative discovery.

---

[3] Nothing in this brief should be construed as conceding that Eligo's customer contracts, or the ways in which it set rates, are sufficiently similar to satisfy Fed. R. Civ. P. 23's requirements for class certification. This brief addresses only the requirements of 28 U.S.C. § 1407, which are fundamentally different from Rule 23's.

10

In fact, Plaintiffs' counsel has confirmed that they intend to seek overlapping documents in all four cases and to re-depose the same Eligo witnesses up to four times each. They said as much in a letter sent to Eligo's counsel on September 28, 2025, just days after Eligo notified the Bodkin court that it intended to move to transfer that action under 288 U.S.C. § 1407. *See* Ex. 10 (letter from plaintiffs' counsel). There, Plaintiffs' counsel proposed for the first time ever to informally coordinate discovery in all four cases. But that proposal – made for the obvious purpose of thwarting this motion to transfer – was hollow. Among other things, Plaintiffs' counsel sought to reserve their right to depose each Eligo witness in each of the four cases, subject only to a vague and unenforceable undertaking to use their "best efforts" not to ask the "same questions." *Id*. Nor did Plaintiffs' counsel offer to abide by any of Judge Ramos's twenty-plus discovery rulings, or to take any other measures to eliminate inconsistent rulings in the four cases.

Centralizing the cases before Judge Ramos will allow him to efficiently manage discovery and eliminate duplication that plaintiffs' belated proposal seeks to preserve. Judge Ramos is uniquely suited to do so because he has already presided over discovery in *Brous*, during which he has heard and decided an incredible 22 discovery motions filed by the Plaintiffs. Judge Ramos also protected certain Eligo witnesses — including its co-founders — from depositions. Without centralization, the plaintiffs are certain to pursue the same depositions that Judge Ramos denied them. Their failure to say otherwise in the letter they sent to attempt to thwart centralization confirms that.

By contrast, discovery has not opened in any of the other cases, and so none of the other assigned judges has had any experience managing discovery in this case. Those factors weigh strongly in favor of assigning all four cases to Judge Ramos. *In re: Aetna, Inc., Out-Of-Network UCR Rates Litig.*, 609 F. Supp. 2d 1370, 1371 (J.P.M.L. 2009) (centralizing cases and stating "we

have selected the District of New Jersey, because (1) Judge Faith S. Hochberg has been presiding over the action before her since July 2007 and she is well-versed with the issues involved in this litigation"); *In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 923 F. Supp. 2d 1376, 1379 (J.P.M.L. 2013) (centralizing cases despite one case being "substantially advanced," and stating "by deciding to assign this litigation to the Honorable Freda L. Wolfson, who has presided over *Mattson* since its commencement, we are confident that she can resolve any problems that may arise due to the different stages of the cases"); *In re L. E. Lay & Co. Antitrust Litig.*, 391 F. Supp. 1054, 1056 (J.P.M.L. 1975) (stating "[w]e have often held that a factor to be considered in the selection of a transferee district is whether the pretrial proceedings in the action or actions in a particular forum are significantly more advanced than those in any of the actions in the other jurisdictions" and transferring cases to the judge who had presided over the most advanced case); *In re Frost Pat.*, 316 F. Supp. 977, 979 (J.P.M.L. 1970) ("While we may not have selected the District of Delaware at the outset of this litigation, the advanced state of discovery in several actions pending there and Judge Wright's familiarity with this litigation compels the selection of the District of Delaware as the only practical transferee forum at this time.").

      **b)**   ***Centralization is necessary to avoid inconsistent rulings and schedules.***

  Without transfer, inconsistent rulings are inevitable. Judge Ramos has already decided numerous discovery issues, such as the scope of document production, including ESI discovery. He has also protected certain Eligo personnel, including Eligo's co-founders, from depositions. Without centralization, Eligo could be forced to re-litigate the same discovery issues in *Bodkin*, *Whiteside,* and *Orzolek*. If that were to happen, it is almost certain that inconsistent discovery rulings would result. Judge Ramos is therefore in the best position to ensure that all four cases are litigated in a way that is both efficient and consistent.

The same applies to substantive matters. In *Brous*, Eligo anticipates filing a motion for summary judgment before the end of this year. That motion will address legal issues that are common to all four cases, including how Eligo's customer contracts should be interpreted and applied. Central to that issue is whether (and to what extent) Eligo's contracts granted it discretion to set variable rates, and whether Eligo's attempt to balance revenue and customer retention was a breach of that contract. Without centralization, there is a significant potential for four different courts to reach inconsistent rulings on those core issues. The same applies to class certification. Without centralization, it could be possible for four courts to reach four different conclusions on whether or to what extent the proposed classes may be certified under Fed. R. Civ. P. 23.

Centralization will also serve the goal of efficiency because, given the similar language used in Eligo's various customer contracts, Judge Ramos' summary judgment ruling in *Brous* may very well resolve issues that would otherwise have to be briefed and argued in *Bodkin*, *Whiteside*, and *Orzolek*. There is considerable efficiency to be gained in having one federal judge manage and decide those issues. Briefing and arguing four separate dispositive motions in four different courts, and potentially four separate motions for class certification, on the other hand, represents precisely the sort of expensive and inefficient procedure that 28 U.S.C. § 11407 was enacted to prevent.

And for the same reasons, centralization will reduce litigation costs and conserve time and effort for the parties and courts. That is particularly so for plaintiffs' counsel, who are based in New York. Moreover, Judge Ramos has already shown that he can efficiently manage this litigation in a cost-effective way for all other parties and their counsel, regardless of their location. In any case, it is far more efficient for the parties to direct their efforts to a single federal judge, as opposed to what they are now doing, which is litigating before four different federal courts, each separated by hundreds of miles.

13

IV.     **CONCLUSION**

These four cases meet all the requirements for transfer and centralization under 28 U.S.C.§ 1407. They involve common issues of fact, and transfer will promote the just and efficient conduct of this litigation. The Panel should therefore transfer *Bodkin*, *Whiteside*, and *Orzolek* to the Southern District of New York, where Judge Ramos can use the experience and expertise he has gained in Brous to efficiently manage these cases.

Date:  September 30, 2025

Respectfully submitted,

*/s/ Ryan D. Watstein*
Ryan D. Watstein
David E. Meadows
Abigail Howd
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
ryan@wtlaw.com
dmeadows@wtlaw.com
ahowd@wtlaw.com
lotoole@wtlaw.com

*Attorneys for Defendants Eligo Energy, LLC and the other Defendants*